1   DAVID C. SHONKA
2   Acting General Counsel
    JANET AMMERMAN
3   CA Bar No. 113996; jammerman1@ftc.gov
4   CHRISTINE M. TODARO
    OH Bar No. 0084976; ctodaro@ftc.gov
5   DANIEL O. HANKS
6   DC Bar No. 495823; dhanks@ftc.gov
7   600 Pennsylvania Ave. NW, CC-8528
    Washington, D.C. 20580
8   Tel:  (202) 326-2222 / Fax:  (202) 326-3395
9   LAURA SOLIS
    WA Bar No. 36005; lsolis@ftc.gov
10  915 Second Ave., Suite 2896, Seattle, WA 98174
11  Tel:  (206) 220-4544 / Fax:  (206) 220-6366

12  Local Counsel
13  BARBARA CHUN
    CA Bar No. 186907; bchun@ftc.gov
14  Federal Trade Commission
15  10877 Wilshire Blvd., Suite 700
    Los Angeles, CA 90024
16  Tel: (310) 824-4343 / Fax: (310) 824-4380
17
18  Attorneys for Plaintiff
    Federal Trade Commission
19
20              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
21
22  | FEDERAL TRADE COMMISSION, | Case No. 2:16-cv-05217 |
23  | | |
24  | Plaintiff, | **COMPLAINT FOR** |
    | | **PERMANENT INJUNCTION** |
25  | v. | **AND OTHER EQUITABLE** |
    | | **RELIEF** |
26  | HERBALIFE INTERNATIONAL OF | |
27  | AMERICA, INC., a corporation, | |
28

1

HERBALIFE INTERNATIONAL, INC., a corporation, and

HERBALIFE LTD., a corporation,

                    Defendants.

Plaintiff, the Federal Trade Commission ("FTC" or "the Commission"), for its Complaint alleges:

1.     The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), in connection with the advertising, marketing, promotion, and sale of a multi-level marketing business opportunity.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a) and 53(b).

3.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and (c)(2) and 15 U.S.C. § 53(b).

## PLAINTIFF

4.     The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41–58.

5.     The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

6.     The FTC is authorized to initiate federal district court proceedings, by its own designated attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or

reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. § 53(b).

## DEFENDANTS

7.     Defendant Herbalife International of America, Inc. is a Nevada corporation with its principal place of business at 800 W. Olympic Boulevard, Los Angeles, California.  Defendant Herbalife International of America, Inc. is a wholly-owned subsidiary of Herbalife International, Inc. and an indirectly wholly-owned subsidiary of Herbalife Ltd., and is employed by those entities to conduct their U.S. operations.  Herbalife International of America, Inc. transacts or has transacted business in this district and throughout the United States.

8.     Defendant Herbalife International, Inc. is a Nevada corporation with its principal place of business at 800 W. Olympic Boulevard, Los Angeles, California.  Herbalife International, Inc. is an indirect wholly-owned subsidiary of Herbalife Ltd.  Herbalife Ltd. employs Herbalife International, Inc. to manage its global marketing company.  Herbalife International, Inc. transacts or has transacted business in this district and throughout the United States.

9.     Defendant Herbalife Ltd. is a corporation organized under the laws of the Cayman Islands with its principal place of business at P.O. Box 309GT, Ugland House, South Church Street, Grand Cayman, Cayman Islands.  Herbalife Ltd. transacts or has transacted business in this district and throughout the United States.

10.     This Complaint refers to Herbalife International of America, Inc., Herbalife International, Inc., and Herbalife Ltd. collectively as "Herbalife" or "Defendants."

11.     At all times material to this Complaint, acting alone or in concert with others, Defendants have advertised, marketed, distributed, or sold the business opportunity at issue in this Complaint to consumers throughout the United States.

3

## COMMON ENTERPRISE

12.     Defendants have operated as a common enterprise while engaging in the deceptive and unlawful acts and practices alleged herein.  Defendants have conducted the business practices described below through interrelated companies that have common ownership, officers, directors, and office locations.  Because Defendants have operated as a common enterprise, each entity is jointly and severally liable for the acts and practices alleged below.

## COMMERCE

13.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

14.     Defendants promote Herbalife as a multi-level marketing business opportunity through which participants may earn compensation by selling weight management, nutritional supplement, and personal care products and by recruiting new participants into the organization.

15.     Individuals who participate in Defendants' business opportunity are called "Distributors" (also referred to herein as "participants").  In 2013, Defendants began calling participants "Members" rather than "Distributors."  The change in terminology, however, was not accompanied by any substantive change to the nature of the business opportunity available to Herbalife participants.

16.     Defendants represent, expressly or by implication, that Herbalife Distributors are likely to earn substantial income, including significant full-time or part-time income, from pursuing a retail-based business opportunity.

17.     In reality, however, Defendants' program does not offer participants a viable retail-based business opportunity.  Defendants' compensation program incentivizes not retail sales, but the recruiting of additional participants who will fuel the enterprise by making wholesale purchases of product.

4

18.     The retail sale of Herbalife product is not profitable or is so insufficiently profitable that any retail sales tend only to mitigate the costs to participate in the Herbalife business opportunity.

19.     As a consequence, the small minority of Distributors who receive substantial income through Herbalife are primarily compensated for successfully recruiting large numbers of business opportunity participants who purchase Herbalife product.

20.     The overwhelming majority of Herbalife Distributors who pursue the business opportunity make little or no money, and a substantial percentage lose money.

### Defendants' Promotional and Marketing Activities Are Misleading

21.     Defendants promote their business opportunity in both English and Spanish through a variety of channels, including videos, live presentations, and print materials.  Through each of these channels, Defendants represent, expressly or by implication, that consumers who become Herbalife Distributors are likely to earn substantial income, including significant full-time or part-time income by purchasing and re-selling Herbalife products.

22.     In some but not all instances, Defendants accompany their misleading income representations with purported "disclaimers."  These purported disclaimers, which often appear in small print, do not alter the net impression created by Defendants' misleading representations, namely, that Distributors are likely to earn substantial income.  (See, for example, the graphic illustration at Paragraph 37, which contains the following disclaimer: "Incomes applicable to the individuals (or examples) depicted and not average.  For average financial performance data, see the Statement of Average Gross Compensation of U.S. Supervisors at Herbalife.com and MyHerbalife.com.")

23.     As in the example at Paragraph 37, Defendants' purported disclaimers typically reference a separate document, the "Statement of Average Gross

Compensation," that supposedly presents "realistic expectations of the possible income you can earn." The Statement of Average Gross Compensation does not provide clarity or realistic expectations, but instead obfuscates through a dense maze of verbiage and numbers. Neither the reference to nor the Statement of Average Gross Compensation itself alters the net impression created by Defendants' misleading representations.

### *Misleading Income Representations*

24. Defendants use videos to promote their business, making them available to Distributors through Herbalife's websites, including myherbalife.com and video.herbalife.com. Defendants have at times also included videos in the starter packs that all new Distributors must purchase. Many of the videos are disseminated in both English and Spanish.

25. Defendants' videos include representations that Distributors are likely to earn substantial income through Defendants' business opportunity; images of expensive houses, luxury automobiles, and exotic vacations; and income testimonials.

26. For example, a promotional video available through February 2016 on myherbalife.com portrays a "Mini-HOM (Herbalife Opportunity Meeting)" at which various Herbalife Distributors take turns giving income testimonials. The video includes the following income representations:

    a. I made $4,100 my second month. . . . And I retired from corporate America. . . . Last month it was $7,300.

    b. I average an extra $1,500 a month part-time, around a 60-hour workweek [working in corporate finance], so you can really build this around whatever you're doing.

    c. I've been a coach on the team for a year and a half. . . . Fast forward maybe a year and five months later, that's when I hit six figures in the company. . . . Couple of months later, I make

over $13,000 a month now.

    d.      My income ended up getting to $4,000 a month, part time, at Herbalife. . . .  It's been five years, my income got up to $10,000 a month a couple years ago.  It's more than double that now.

27.      Another video, "Design Your Life," was included in every new Distributor's starter pack until January 2013 and was available on video.herbalife.com until October 2014.  Because Defendants intended the "Design Your Life" video to be given to potential recruits, ten copies of the DVD were included in the starter pack.  In addition to images of expensive cars and opulent mansions the video includes the following testimonials:

    a.      About a year and a half into the business, still part-time, I was making $2,500 a month.

    b.      First month in the business, without having a clue . . . first month it was unbelievable, actually, our income was $1,500.

    c.      A year exactly after I started the business, my checks that month were $5,468.28.  Two months later my check went up to $7,080—and that was the month I went on vacation, and came back, and got that $7,000 check!  So, it's been amazing.

    d.      You know, the royalties grew five times in five months, and last month, we hit about $16,000.

    e.      When I got to ten thousand, I thought, well that wasn't so hard after all, maybe I can get to fifteen, and I went from fifteen, to twenty, and then to thirty, and then even up to forty thousand dollars a month.

    f.      The first nine months of really getting going, I had made a quarter of a million dollars.

28.      The "Design Your Life" video also includes the following:

7

There are basically three types of people Herbalife is looking for. What you need to do next is get back to the person who gave you this video and let them know what you are.  Just tell them A, B, or C . . . Category A is someone who might be saying . . . I don't need any extra income but the products sound great . . . I want to get started on the products right away.

Category B is someone who might be saying, you know, the products sound great, and I'd like to start a small business to earn an extra $500 to $1,500 a month part-time . . . .

Category C, you might be saying, wow, everything sounds great.  I like the products and would like to start a big business that could generate a career level income or more.  $2,500 to $10,000 a month. . . .

You make the choice.  Are you A, B or C?

29.    In addition, from at least January 2009 through August 2013, a DVD called "Getting Started" was included in the starter packs that all Distributors must purchase.  The most recent version of "Getting Started" included the testimonials of Distributors "Glenn" and "Jennifer":

a.    Glenn explains that he was a bartender, "broke" and "struggling to pay [his] bills," before becoming an Herbalife Distributor.  Although he "didn't have any formal education" or "any business background," he quickly succeeded with Herbalife and was able to make enough money to quit his job and work full-time as an Herbalife Distributor.  Now "I'm able to live in a beautiful home, drive whatever I want, and there's nothing else I'd rather do than work from home, be able to set my own schedule, and be my own boss."

b.    Before Herbalife, Jennifer wanted to be a stay-at-home mom for

her son.  However, she had to put her son in daycare and work long hours while her husband worked eighty-hour weeks.  After just four months as an Herbalife Distributor, she "went full-time, took [her] son out of daycare, and [] became that stay-at-home mom."  Today, she and her husband are both stay-at-home parents, "we travel the world, we have a six-figure income, and this company and the products have totally changed my life."

30.    Defendants also sponsor numerous events for Distributors in both English and Spanish.  Many of these events include live presentations at which speakers boast about the high incomes they earn as Herbalife Distributors.  These events have names such as "Extravaganzas," "Leadership Development Weekends," and "Success Training Seminars."

31.    Defendants strongly encourage Distributors to attend these events, which often require Distributors to pay an attendance fee and/or purchase a minimum amount of product from Herbalife.  Defendants craft the agendas and select the speakers who present at these events.  Speakers are usually chosen from among the very small percentage of Herbalife participants who have reached the highest status levels of the Herbalife organization.  The presentations made by the selected top Distributors repeatedly emphasize that Distributors are likely to earn substantial income through Herbalife, and that Distributors' income potential is limited only by their own efforts.

32.    For example, speakers giving live presentations at Defendants' events have made the following statements:

a.    [H]ow many of you would like to make at least a million dollars a year in income?  I gotta tell ya, every extra million dollars, I find, comes in handy.  OK?  You know?  Then you get 2 million, 5 million, you know, and with the increases of

20%, 25%—

Even now, you can put into your mind—like, if you made a hundred thousand dollars last year, and your income went up proportionately, an extra twenty thousand dollars?  That's pretty cool, huh?  Couple thousand a month?  You make five hundred thousand dollars, would an extra hundred thousand dollars come in handy?  And we're gonna go through how to make it happen.

[Herbalife Chairman's Club member John Tartol, 2012 President's Summit, Los Angeles]

b.     . . . I can remember when I was new, and I didn't know anything, I didn't know anybody, didn't have any sales or marketing experience, I didn't know, how was I ever gonna get successful? . . .

And make no mistake about it, 'cause it happened for me, I'm living proof that it can happen, and all the people down here in this floor here, and the people behind you, all of us are, you know—I'm a multi-millionaire, but, you know, all of us are getting groomed to become multi-millionaires.  That is an awesome opportunity.

Now, you can take advantage of it, or you may only want to make sixty thousand, a hundred thousand, a couple hundred thousand.

[Herbalife Founder's Circle member Geri Cvitanovich, 2010 Herbalife Extravaganza, Los Angeles]

c.     [translated from Spanish] It has been 15 years since we arrived here in the United States searching for the American Dream . . . .  In '95, we came from Mexico to the United

10

> States . . . .  I lasted 7 years in a cleaning company, 7 years
> earning $2,000 a month.  We started the business doing it part
> time, the income started coming, it was something incredible,
> our lifestyle started to change spectacularly. . . .  In the last
> three months the company has paid us more than $45,000.
> Welcome to Herbalife!
> [Raul Sánchez, Herbalife President's Team member, 2009
> Herbalife Extravaganza Latina, Atlanta]

33.    In addition to the spoken content, the live presentations at Defendants' events often involve images of expensive houses, luxury automobiles, and exotic vacations.

34.    Defendants have recorded many of the live presentations given at Defendants' sponsored events and have formally integrated the presentations into their own resources, making the recordings available to Distributors through Herbalife's websites, including myherbalife.com and video.herbalife.com.

35.    Like Defendants' videos and sponsored-events, Defendants' print publications include representations that Distributors are likely to earn substantial income through Defendants' business opportunity.

36.    Defendants' print publications include, for example, "Your Business Basics," which is available in both English and Spanish and is provided to all new Distributors.  From 2014 through at least December 2015, "Your Business Basics" included the following representations:

a.    Earn extra money each month. \ Be your own boss. \ Have the time and money to enjoy the finer things in life.

b.    Regardless of your background and job experience, you can succeed because we have people just like you who started where you are and are now earning substantial incomes.

c.    Your income and lifestyle potential with Herbalife are yours to

determine.  Thousands of others like you have achieved success with Herbalife.  You can do it!

d.   From nutrition to the business opportunity, you'll see there's no limit to your personal or financial potential, and others just like you have tapped into this incredible opportunity.

37.   The "Presentation Book" is another of Defendants' publications that is available in both English and Spanish and that is provided to all new Distributors. It is designed to be shown to potential recruits.  The English-language version of the Presentation Book that was included in the starter pack from 2012 through 2014 stated that Herbalife offers "[t]he opportunity to earn more than you ever thought possible and make your dreams come true!"  That publication, a page of which is shown below, included pictures of big houses, fancy cars, cash, and boats alongside the text "Great Products Mean Great Business Opportunities!  Dream it. Do it."



38.   Other versions of the Presentation Book have also included Distributor income testimonials:

a.   . . . I started my Herbalife business with the goal of quitting my job as a collection specialist within a year.  Just 13 months later, I realized that dream! . . .  And with my $6,500-a-month income, we've been able to move into a new house and renovate.

b.   Now, while earning $25,000 a month with Herbalife, I get to do all the things I love:  play music and ride my motorcycle!

c.   We went from bankruptcy to being set for life!

39.   From 2012 through 2013, the Spanish-language version of Presentation Book offered similar income testimonials (translated here into English):

a.   The days when I would earn a living cleaning houses are behind me because now we are fully dedicated to our prosperous Herbalife business.

b.   When we worked in factories our earnings could only pay for basic needs, but now we can take our 12 grandkids on vacations.  These are the best years of our lives.

c.   Before Herbalife I worked on a ranch tending cattle, but when my sister showed me her royalty check she convinced me then and there.  Today, at 22 years old, I'm economically independent.

d.   We figured out that if we worked hard with our independent Herbalife business, we could achieve anything:  health, wealth, and financial liberty.  And that's exactly what we've done!

40.   Similar representations regularly appear in the Defendants' magazine, "Herbalife Today," which is available in both English and Spanish and is provided online to Distributors through myherbalife.com.  The March 2013 issue of "Herbalife Today," for example, includes the following testimonials:

13

a.   Now I have the freedom to do what I like.  I can travel the world and help others change their lives wherever I go.

b.   Today, as Independent Distributors, they're able to work from home, take vacations and have a flexible schedule.

c.   Now, Dan and Orlyn feel they have found financial stability and take pride in helping others find better nutrition and financial success.

41.   To help Distributors recruit new participants, Defendants have provided Distributors with several tools and training materials, including the videos and print materials discussed above.  Defendants encourage Distributors to use these materials in attempting to recruit new participants.

### *Misleading Representations Regarding Income from Retail Sales*

42.    Many of Defendants' representations that Herbalife participants are likely to earn substantial income expressly or impliedly represent that Herbalife participants earn significant full-time or part-time income from selling Herbalife products at retail.

43.   Defendants' promotional materials often focus on the growth of the weight-loss industry as a result of the worldwide "obesity epidemic," and claim or imply that this industry growth translates into the potential for making large amounts of money from the retail sale of Herbalife weight management products. For example, the "Ready To Go" video, available through February 2016 on video.herbalife.com, begins by portraying a bleak picture of the current state of the economy ("rising unemployment," "layoffs," "salary reductions," "reduced benefits") and urges the viewer to "take control of your . . . situation / financial future / life" and "join the emerging megatrend of wellness."  The video cites estimates that the global weight loss market will reach $672 billion by 2015 and explains, "[t]hat spells growth  / opportunity / the answer you've been looking for." The video makes the following invitation:  "Get in on the opportunity / the health

14

and wellness megatrend / the premier nutrition and wellness company in the world. Get in on Herbalife."

44.     In 2013, Defendants created and made available to Distributors a PowerPoint presentation to show prospective and newly-recruited Distributors. The presentation, which was still in use in 2015, claims that "total revenue in the fitness industry reached $21.8 billion in 2012," and that "statistics show a rise in consumer spending for body image concerns." The presentation goes on to portray Herbalife as "the brand leader" in the meal replacement category, noting that in 2012 the company had "over $6.4 billion [in] suggested retail sales." The presentation claims that through offering "great products" and a "great business," Herbalife "allows you to earn Member discounts and profits instantly by retailing products."

45.     Similarly, the "Getting Started" video mentioned above at Paragraph 29, which was included in the starter pack for new Distributors from at least January 2009 through August 2013, claims that the 3 trillion dollar weight-loss industry "has surpassed the GNP of all major European countries." The video goes on to claim that Herbalife, "with more than 2.5 billion dollars in sales generated by a team of over one million distributors throughout the world," is a leader in this industry, which "has become the newest financial powerhouse in the world." Herbalife is described as a "great business opportunity": "You have the opportunity for financial independence and freedom; you can do it with helping people change their lives, by getting them in a better nutritional mode, by getting them healthier."

46.     The "Mini-HOM (Herbalife Opportunity Meeting)" promotional video available through February 2016 on myherbalife.com presents testimonials that expressly or impliedly represent the full-time or part-time income that participants earn from selling Herbalife products at retail, by emphasizing how much money participants can make immediately (presumably before they have

had a chance to build an organization that would generate recruiting-reward payments):

    a.    In my first three weeks, I made an extra $1,200 around my full-time nursing schedule.  So this is really part-time, doing this super part-time, and I just saw the potential with this . . . .

    b.    I started as a client, I was actually the CFO of an entertainment finance company . . . .  So, you know, had the career down . . . .  Went to a volleyball tournament that I was already gonna play in.  Everyone on the beach, you guys, was like, what are you doing, you look better than you did when you were at UCLA, like, hook me up, like, help me, basically!

        . . .  You know, my three days on the beach at a beach volleyball tournament, I made $2,100.  And I wasn't actively looking for extra money, but I wasn't gonna give it back.

    c.    [I]n my first month, I made an extra 500 bucks around . . . a crazy corporate job.

47.    In the "Design Your Life" video, available on video.herbalife.com until October 2014, one of the speakers states that Herbalife's "great consumable products that people want and need [are] why we have an incredible financial opportunity."  A speaker later states that as an "Herbalife Distributor you can develop a successful retail base to help put money in your pocket every day and every month."  A voiceover additionally states that "[w]ith just ten customers, each spending a hundred dollars a month, you can take in a thousand dollars in retail sales, and make up to $420 in profit."

48.    The "Design Your Life" video also presents numerous testimonials that expressly or impliedly represent the full-time or part-time income that participants earn from selling Herbalife products at retail:

    a.    My first week in the business, part-time, just learning what to

do, I earned $1,000!  . . .  [M]y first month, part-time, I earned over $5,000!

b.    I earned $420 in my first ten days. . . . working this business part-time.  I was able to fire my boss, and I've never had a real boss since.

c.    When I got started on these products, I got such great results that I made a thousand extra dollars my first month. . . .  And so I kept working my business part-time . . . while I was still [working as a nurse] full-time . . .

d.    When I got started, my first day I actually earned $420 . . . .

e.    [I]n the month of August I had retail sales of $3,700.

49.    Print materials included in the starter packs that all new Distributors must purchase also portray an opportunity to earn significant income through retail sales of Herbalife products.  For example, from 2014 through at least December 2015, the "Sales & Marketing Plan and Business Rules" book, which is included in the starter pack for new Distributors, discussed the opportunity for Distributors to make "Immediate Retail Profit" from direct sales to customers and states that retailing is an important "key to success" as an Herbalife Distributor.

50.    From 2014 through at least December 2015, the book "Building Your Business," which is also included in the starter pack for new Distributors, represented that "a satisfied customer base can provide you with regular, long-term income."

51.    Similarly, through at least December 2015, a pamphlet that is also included in the starter pack for new Distributors, "Your First 72 Hours:  Making Your First Sale," provides instruction on "making your first sale in 5 easy steps."

**Defendants Do Not Offer a Viable Retail-Based Business Opportunity**

52.    Although Defendants represent, expressly or impliedly, that Distributors will be able to sell Herbalife products at a profit, Defendants do not

17

track either the existence or profitability of Distributor attempts to retail Herbalife products.

53.     The overwhelming majority of Herbalife Distributors who pursue the business opportunity do not make anything approaching full-time or even part-time minimum wage because the promised retail sales to customers simply are not there.

54.     Even according to Defendants' own survey, sales to customers outside the Herbalife network account for only 39% of Herbalife's product sales each year; the remaining approximately 60% is simply Herbalife selling to its own Distributors.  [Herbalife Press Release, July 22, 2014]

55.     Analysis of Defendants' own Distributor purchase data shows that, even under favorable assumptions about Distributors' market reach and sales price, the overwhelming majority of Herbalife Distributors who pursue the business opportunity make little or no money from retail sales.  Under these assumptions, and assuming no costs other than an individual's total payments to Herbalife, half of Distributors whom the Defendants designate as "Sales Leaders"[1] average less than $5 per month in net profit from retail alone, and half of these Distributors lose money.[2]

56.     As a direct-selling company, Defendants encourage Distributors to sell product face-to-face to family and friends, and to customers with whom they are supposed to develop personal relationships.  Distributors are taught to follow three key steps in retailing the product: use the product themselves, wear a button

---

[1] "Sales Leaders" are defined by Defendants as Distributors who have reached status levels of "Supervisor" and above.  Approximately $3,000 in product purchases are required to reach the lowest level of "Sales Leader."  "Sales Leaders" may purchase products from the Defendants at a 50% discount, which is the largest discount available to Distributors.  *See* ¶¶ 111–18.

[2] This figure is based on analysis of Distributors who joined in 2009–11 and were designated as "Sales Leaders."  It assumes that they sold 75% of the product they purchased, at the full suggested retail price, and incurred no expenses other than the monies they paid to Herbalife.

advertising Herbalife, and talk to people ("use, wear, talk").

57.    In order to restrict sales to the direct-selling channel, Defendants have adopted rules that effectively prevent Distributors from being able to sell to a larger customer base.  Defendants' rules prohibit the sale of product in retail stores and impose many restrictions on online selling.  Nonetheless, Defendants foster an illusion that Distributors can make significant full-time or part-time income from retail sales.  One way in which Defendants accomplish this is by promoting the concept of the "Nutrition Club."  The Nutrition Club model was developed from an idea that started in Mexico and, according to Defendants, has particular appeal for members of the U.S. Latino community.

58.    According to Defendants, the Nutrition Club is supposed to be a neighborhood gathering place to promote health and wellness, and to provide income for the Nutrition Club owner.  In practice, Nutrition Clubs operate primarily as a tool for recruiting new members rather than as a method for profitably retailing Herbalife products.

59.    Defendants encourage Distributors to lease a commercial space (or use space in their homes) to operate a business similar to a juice bar, in which the Distributor will work on a daily basis as the owner and sole employee.  [Herbalife Rule of Conduct 8.1.3]

60.    Customers who come to the club pay a daily "membership fee" of a few dollars that entitles them to consume certain Herbalife products that are prepared on the premises.  Visitors typically receive one serving of soy protein powder mixed with water and ice (referred to as a "shake"), herbal tea, and aloe.  This method of operating an Herbalife business is often referred to as "daily consumption."

61.    To find customers, Nutrition Club operators are encouraged to pass out flyers to potential customers on the street, at their children's school, or other locations, inviting them to visit the "club."

62.     While only a small percentage of the roughly half-million U.S. Herbalife Distributors report operating Nutrition Clubs, Defendants claim that club owners purchase a disproportionate amount of volume of Herbalife product.  In 2012, Defendants estimated that there were 3,700 commercial Nutrition Clubs in the North America region (consisting primarily of the United States); Defendants also claimed that Nutrition Clubs were driving 30–35% of the overall volume of product purchased in the United States.  [Herbalife Second Quarter 2012 Earnings Conference Call]

63.     Although Nutrition Clubs would appear to be retail establishments, Defendants' rules provide that Nutrition Clubs are not retail stores or outlets, nor are they restaurants or carry-out establishments.  Nutrition Clubs are not intended to attract "walk-in" traffic; Defendants' rules prohibit signs that state or suggest that Herbalife products are available for retail purchase on the premises.  Club owners are not permitted to post signs indicating whether the club is open or closed, and the interior of the club must not be visible to persons outside. [Herbalife Rules of Conduct 8.3.3, 8.4.3, 8.4.4]

64.     Club operators may not post, list, or charge prices for servings of prepared products such as shakes, teas, or aloe.  The only permissible charge in connection with the provision of these products is the "membership fee." [Herbalife Rules of Conduct 8.2.1, 8.2.8]  Provision of the shake, tea, and aloe generally costs a Distributor a few dollars, leaving little of the "membership fee" to cover the various operational expenses associated with the club.

65.     Although Defendants create the impression that Nutrition Club owners will make significant full-time or part-time income from retailing Herbalife products to customers at their clubs, many Distributors find it all but impossible to make enough money from retail sales of product to cover the overhead of the club and also generate income for the owner.

66.     Many club owners incur thousands of dollars in expenses—including

but not limited to product purchases, rent, utilities, supplies, and licensing fees—that they are unable to recover through the operation of their clubs, and end up losing money.

67.   In fact, Defendants' own telephone survey of 433 current and 69 former Nutrition Club owners in February 2013 paints a discouraging picture of the experience of many Nutrition Club owners.  Fifty-seven percent of Nutrition Club owners reported that their clubs made no profit or lost money.  Club owners reported spending an average of about $8,500 to open their club.

68.   Some Nutrition Club owners continue to operate their clubs for little or no profit—or at a loss—for years, in the hope that things will turn around and their investment will eventually pay off.  However, the promised retail-based business opportunity is simply not there.

69.   Because Nutrition Clubs are expressly not retail establishments and are often unprofitable, they are principally of value to a small minority of financially successful Herbalife Distributors as a location from which they can recruit new participants.

70.   As one top Distributor explained in a PowerPoint presentation:
[Nutrition Club] Operators need to realize that the end goal is not how many $4.00 services they sell each day as that is not the way for them to achieve their financial goals.  Rather, it's upgrading a Consumer to become a Customer and eventually a Distributor and ultimately having Distributors become Operators who will duplicate the Nutrition Club method.
["Financial Success System" presentation dated March 24, 2010]

71.   "Successful" Nutrition Club owners make money not from retailing product, but from recruiting other participants who are encouraged to open their own clubs, buy more product, and recruit more participants.  When recruited participants purchase product to sell at their clubs, these purchases generate

recruiting rewards for the sponsor, even if the clubs themselves lose money.  These recruiting rewards are the only pathway to achieve the high incomes touted in Defendants' promotional materials.

72.    Regardless of whether Distributors operate a Nutrition Club, Distributors experience difficulty in selling product to customers outside the network.  Nevertheless, Defendants' compensation structure puts pressure on Distributors to purchase large quantities of product in order to qualify for greater wholesale discounts and recruiting-based rewards (*see* discussion below at ¶¶ 135–44).

73.    As a result, many Distributors buy product that they find difficult to sell.  Although Defendants have a buy-back policy, in order to take advantage of the policy, a Distributor must resign his distributorship.  Many Distributors have been unaware of the policy or, for various reasons, have been reluctant to attempt to use it.

74.    Distributors dispose of excess product purchases in numerous ways.  At the simplest level, when Distributors are left with product they are unable to sell they may give it to friends, throw it away, or gradually consume it themselves.  Such self-consumption is not driven by genuine demand for the product, but is the easiest and most convenient way for a Distributor to get some benefit from product that the Distributor would not have bought absent his or her participation in the business opportunity.  In other instances Distributors attempt to sell their excess inventory at a discount on auction websites or at flea markets, although such efforts to mitigate their losses are prohibited by Defendants' rules.  [Herbalife Rules of Conduct 4.1.1, 7.3]

75.    The overwhelming majority of Distributors who attempt to retail the product make little or no net income, or even lose money, from retailing the product.

*Distributors Abandon the Business Opportunity in Large Numbers*

76.     In light of their poor financial results, many Distributors either stop buying product or leave the organization altogether, resulting in a high turnover rate.

77.     Despite Defendants' efforts to promote retention of Distributors whom it characterizes as "Sales Leaders," in 2014 nearly 60% of first-time Sales Leaders did not purchase sufficient product to requalify as Sales Leaders. [Statement of Average Gross Compensation Paid by Herbalife to U.S. Members in 2014]

78.     Retention for non-Sales Leaders, many of whom are pursuing the business opportunity, is even worse.  An analysis of Defendants' data shows that the majority of Distributors stop ordering Herbalife products within their first year, and nearly 50% of the entire Herbalife U.S. Distributor base quits in any given year.  Roughly half of all Herbalife Distributors at any given time are in their first 12 months of membership, and roughly 40% of the volume of Herbalife products sold by Defendants each year is sold to participants in their first year.

79.     During 2009–13, an annual average of approximately 242,000 new Distributors signed up in the United States.  On average, 89% of those newly-recruited Distributors, however, simply replaced U.S. Distributors who left that same year, with an annual average of approximately 216,000 Distributors leaving during this time period.

80.     For example, while approximately 277,000 new Distributors joined Herbalife in the U.S. in 2013 (from a base of approximately 520,000 Distributors at the end of 2012), approximately 256,000 existing Distributors left that year.

*Defendants' Business Opportunity is Based on Recruitment*

81.     Notwithstanding Defendants' express and implied representations that Herbalife offers a retail-based business opportunity, in truth the only way to achieve wealth from the Herbalife business opportunity is to recruit other

23

Distributors.  Purchases by these recruited Distributors, referred to as a "downline," generate rewards for the sponsoring Distributor.  (*See* ¶ 119.)  Through a variety of channels, Defendants admit, expressly or by implication, that recruiting is the key to financial success.

82.  Defendants' print materials emphasize the importance of recruiting new Herbalife participants.  For example, through at least December 2015 the book "Building Your Business," which is included in the starter kit that every Distributor must purchase, discussed "the power of duplication" and illustrated "what you can achieve" if "you recruit and retain two active Supervisors."  In the illustration, the Distributor purchases a certain quantity of product (costing over $1,000) each month and recruits two new participants who also purchase that quantity each month.  Those two participants then recruit a total of twelve additional participants in two additional levels below them.  For each month that the Distributor and the fourteen recruits purchase the specified quantity of product, the Distributor will earn $1,750.



83.  The English-language version of the 2012-2014 Presentation Book also includes examples of how recruiting two or three new participants can translate into $2,450 to $8,775 per month for the recruiter, assuming that the new participants make substantial wholesale product purchases and themselves recruit

new participants who also make substantial wholesale product purchases.

84.     The Spanish-language version of the 2012-2013 Presentation Book similarly discusses "the power of duplication" that can result when "you bring in 3 people to the business, who each bring 3 people, who in turn bring 3 people . . . ." (translated from Spanish).

85.     Speakers giving live presentations at Defendants' events also make representations concerning the importance of recruiting in Herbalife's compensation program:

a.      It's wonderful that we have everybody consuming and we have everybody doing the different methods of retail . . . but you got to think about it, guys, the name of the game here is royalty . . . and you don't get paid royalty off of customers.  You get paid royalties off of distributors that you help to become successful to become supervisors.  [Herbalife Founder's Circle member Susan Peterson, 2009 Herbalife Extravaganza, Atlanta]

b.      [translated from Spanish] The only way to scale the ladder of success is through sponsorship.  [Herbalife President's Team member Dalia González, 2009 Herbalife Extravaganza Latina, Atlanta]

c.      The key to royalty growth[:]  New distributors qualifying as Supervisor every month.  [Herbalife Chairman's Club member Kurt O'Connell, "Building Your Royalties" Presentation, 2011 Herbalife Extravaganza, Las Vegas]

86.     Savvy Distributors have figured out ways to use the recruiting reward structure to reap rewards, even without profitable retail sales.  For example, during the years 2009–14, one top Distributor paid over $8 million for product (with a total Suggested Retail Price of over $16 million) which the Distributor purchased in the names of various downline members, thereby generating additional rewards

25

and qualifying for higher payments from Defendants.  This Distributor then donated all of this product to charity, rather than attempting to sell it.  The Distributor generated enough rewards through these purchases to make a net profit, without even selling the products.

87.     Similarly, other Distributors have used unprofitable retail sales of product to generate large reward payments.  These Distributors have created specialized websites offering products at discounts of up to 50% with no tax and free shipping.  Although the net profit earned from these online retail sales has been *de minimis*, by manipulating Herbalife's compensation system, these Distributors have generated significant "recruiting" reward payments from the large volume of product purchases made by their purported downlines.

**Few Business Opportunity Participants Earn Recruiting Rewards**

88.     Although recruiting is the only path to a high income, very few Herbalife participants earn income from recruiting.

89.     Most Distributors (80%) do not successfully recruit any new participants, and therefore receive no recruiting rewards.

90.     Even among those who do recruit, a substantial percentage receive no reward payments.  For example, as of December 31, 2014, more than 111,000 U.S. Distributors had recruited a downline, but approximately 43% of them (47,714) received no reward payments from Defendants. [Statement of Average Gross Compensation Paid by Herbalife to U.S. Members in 2014]

91.     Income from recruiting is low even for many in the top 13% of all Distributors—those who reached the status of "Sales Leaders with a downline."  In 2014, more than half (57.6%) of the Distributors in this elite group received average gross reward payments from Defendants of under $300 *for the year.* [*Id.*]

92.     Rewards are highly concentrated among a small number of Distributors.  In contrast to the experience of the vast majority of Distributors who

make little or no money from recruitment-based rewards, the top 0.03% of U.S. Distributors (205 individuals) received average gross reward payments of over $600,000 per year.  [Statement of Average Gross Compensation Paid by Herbalife to U.S. Members in 2014]

93.    For the fewer than 1% of Distributors who receive substantial income through Defendants' business opportunity, their compensation for recruiting large numbers of new business opportunity participants dwarfs whatever they might make from retail sales of the product.

94.    The overwhelming majority of Herbalife Distributors who pursue the business opportunity earn little or lose money, while those few Distributors who do make a living from their Herbalife business do so by recruiting other business opportunity participants who purchase product, not by retailing the product.

**To Confuse Participants and the Public About Distributors' Poor Financial Outcomes, Defendants Understate the Percentage of Distributors Who Are Pursuing the Business Opportunity**

95.    Although Defendants heavily promote their business opportunity, in recent years Defendants have begun to claim that most consumers who sign up to be Distributors are merely customers who purchase the product only for their own consumption and are not interested in pursuing the Herbalife business opportunity.

96.    Defendants do not offer a separate "customer" or "discount buyer" status for  consumers who are uninterested in pursuing a business opportunity and thus do not systematically track or distinguish Distributors who might be "discount buyers" from Distributors who are pursuing a business opportunity.

97.    Defendants' rules provide that all consumers who sign up with Herbalife must enter into an agreement that includes the business opportunity.  The 2015 version of that agreement consists of seven pages of small print and includes a number of provisions that would be inapplicable to a "discount buyer," such as a requirement that the participant indemnify, defend, and hold harmless Herbalife

from any cost or liability arising from the participant's breach of the agreement or the conduct of his or her Herbalife business.

98.     Since 2013 Defendants have publicly claimed or implied that a mere 27% of their Distributors are pursuing the business opportunity either full-time or part-time, and that a "substantial majority" (73%) are simply interested in buying Herbalife products for their own personal consumption.

99.     Defendants' express or implied claim that a "substantial majority" of their Distributors are not pursuing the business opportunity is based not on Distributor behavior, but on surveys commissioned by Defendants beginning in July 2012 that are flawed and unreliable.  For example, many survey participants who were included in the category of Distributors who purportedly "joined Herbalife primarily as discount customers" themselves reported that they quit Herbalife because "finding new customers was too difficult and/or time consuming," or the "business was harder than [they] originally believed."

100.    Based on such survey results, even some Distributors who reach "President's Team" (the highest status level in Herbalife) and earn over $100,000 in recruiting rewards annually from the business opportunity have been categorized in Defendants' representations as merely "discount buyers."

101.    When observable Distributor behavior from Defendants' data is analyzed, the percentage of Distributors who are attempting to earn income from the Herbalife business opportunity readily exceeds the 27% in Defendants' claims. Such behaviors include, for example, purchasing promotional literature and sales and recruiting aids from Defendants.

102.    Furthermore, many Distributors interested in the business opportunity may make some effort to earn income and fail, without engaging in the type of measureable and overt behaviors that would make their pursuit of the business opportunity readily apparent.

103.    In short, many of the Distributors whom Defendants would expressly

28

or impliedly characterize as solely "discount buyers" are, in fact, pursuing the business opportunity.

104.   Regardless of the number of so-called "discount buyers," it is clear that collectively they could account for only a small percentage of the volume of Defendants' products sold in the United States.  Even using a grossly overstated measure of "discount buyers"—that is, counting as "discount buyers" the roughly 80% of participants who are not  "Sales Leaders"—such Distributors collectively account for less than 25% of the volume of Defendants' products sold in the United States.  The remainder, over 75%, is purchased by Distributors at the "Sales Leader" level, who are clearly pursuing a business opportunity.

## Overview of Defendants' Compensation Plan

105.   The amount of compensation a Distributor receives from Defendants is not based on retail sales of Herbalife products, but rather is based on the volume of product purchased by the Distributor's recruits, and by their recruits, and so on.

106.    Thus, the compensation plan contains incentives for Distributors to recruit participants and to persuade them to buy as much product as they can.

107.   To become a Distributor, an individual must pay either $59.50 or $92.25, plus tax and shipping, to purchase a starter pack called an "International Business Pack,"[3] the contents of which have varied over time but which have included an Herbalife tote bag; samples of various Herbalife products; literature about Herbalife's products; sales aids (such as a "Presentation Book" and buttons the distributor is supposed to wear to advertise Herbalife); DVDs about the business opportunity such as "Design Your Life"; multiple publications concerning the Herbalife business opportunity, including the pamphlet "Your First 72 Hours: Making Your First Sale" and the books "Your Business Basics," "Using &

---

[3] In 2013, Defendants began calling the pack required for all new participants the "Herbalife Member Pack" rather than the "International Business Pack."

Retailing Your Products," "Building Your Business," and "Sales & Marketing Plan and Business Rules"; and a single receipt form that can be given to a customer in the event of a single sale of product.

108.   Defendants' rules provide that participants must enter into an "Agreement of Distributorship" either online or, if the pack is not purchased online, in hardcopy form.  (In 2013, Defendants began calling the agreement an "Herbalife Membership Application and Agreement" rather than an "Agreement of Distributorship."  The change in terminology, however, was not accompanied by any substantive change to the nature of the business opportunity available to Herbalife participants.)  Upon purchasing the International Business Pack and submitting the Agreement to Defendants, a participant is assigned an Herbalife ID number and becomes an official Distributor.

109.   The details of Defendants' compensation program are complex and convoluted, and involve specialized terminology and concepts.  These details, terminology, and concepts are laid out in a book included in the International Business Pack entitled "Sales & Marketing Plan and Business Rules."  The 2014 version of the "Sales & Marketing Plan and Business Rules" has 114 pages and consists of more than 58,000 words.  The book is difficult to read and understand and many participants rely upon their sponsors to explain the program.

110.   The core concepts of Defendants' compensation program are as follows:

a.     Participants advance to higher status levels in the organization and qualify for reward payments based on product purchases (not product sales); and

b.     The only way to reach the highest levels of compensation is to recruit more participants.

A simplified version of the compensation plan is set forth below.

111.   New recruits start at the lowest level, called "Distributor" (or, since

2013, "Member").  A Distributor can purchase product from Defendants at a discount of 25% off the "earn base" (a dollar value that Defendants assign to each product that is generally slightly less than the value that Defendants assign as the Suggested Retail Price for that product).  The only way a participant at this level can make money is to buy product from Herbalife and sell it to a customer for more than his total cost, with the difference representing the participant's "Retail Profit."  "Retail Profit" is also the only form of compensation available to those Distributors who have not recruited other Distributors.

112.   The vast majority of Herbalife participants never progress higher than the Distributor level, and most stop purchasing product within a year and do not renew their memberships.

113.   Higher status levels are obtained by meeting threshold requirements of "Volume Points," which are accumulated by purchasing greater quantities of products.  (The "Volume Point" is a unit created by Defendants to measure the value of product purchases across currencies.  A product with a Suggested Retail Price of $100 generates roughly 100 Volume Points.)  The Sales and Marketing Plan contains complicated rules regarding how much of the threshold Volume Point requirement must be volume that is personally purchased by the Distributor, and how much may be volume purchased by other Distributors whom he recruits.

114.   A Distributor can advance to the status level of "Senior Consultant," which allows him to purchase product at a 35% discount, by accumulating at least 500 Volume Points in one month.

115.   A Distributor who purchases 1,000 Volume Points in a single order obtains the status of "Success Builder" and is entitled to a 42% discount for that month.

116.   A Distributor who accumulates a total of 2,500 Volume Points over one to three months obtains the status of "Qualified Producer" and is entitled to a 42% discount through the following year.

31

117.   The maximum discount, for those at the "Supervisor" status level and above, is 50% off the "earn base."  A Distributor who accumulates a total of 4,000 Volume Points obtains "Supervisor" status and is entitled to a 50% discount through the following year.

118.   If a Distributor makes it to the Supervisor level, there are numerous higher levels that offer additional rewards that are based on recruiting.  Herbalife refers to Distributors who reach the Supervisor level or above as "Sales Leaders."

119.   The essential requirement for moving up to the highest status levels is recruiting a large "downline."  A given participant's "downline" is comprised of all those whom the participant has personally recruited (Level One), all those recruited by his Level One participants (Level Two), and so forth, down to as many levels as have been created by recruitment.

### Defendants' Compensation Plan Incentivizes Recruiting

120.   Defendants' compensation plan gives participants a powerful incentive to recruit more participants, because recruiting a downline entitles a participant to receive multiple different types of payments directly from Defendants.

121.   One such type of payment is called "Wholesale Profit" (or "Commissions").  An Herbalife participant may receive "Wholesale Profit" based on purchases made by participants he has recruited who are at a lower discount rate.  For example, if a participant at the "Supervisor" status level (50% discount rate) recruited a participant at the "Senior Consultant" status level (35% discount rate) who then ordered product with a Suggested Retail Price of $100, the participant at the "Supervisor" level would receive a commission check from Defendants of approximately $15, representing the 15 percentage point difference between the two participants' discount rates.

122.   An additional type of payment based on downline purchases, available to participants who are at or above the status level of "Supervisor" and who have

recruited a downline, is called "Royalty Overrides."  To understand how Royalty Overrides work, it is necessary to understand two "volume" concepts in Defendants' Sales & Marketing Plan:  "Total Volume" and "Organizational Volume."

123.   "Total Volume" is a total of the Volume Points associated with a participant's own product purchases, plus the Volume Points associated with the product purchases made by certain members of the participant's downline. Specifically, the "Total Volume" of Participant A would include the product purchases of Participant A's downline members who (i) have a status level lower than "Supervisor," and (ii) do not have any participants who have a status level of "Supervisor" or higher in the chain of participants between them and Participant A.

124.   In simplified form, "Organizational Volume" refers to the Total Volume of a participant's first three levels of "Supervisors" who are active in a given month.

125.   "Royalty Overrides" are payments ranging from 1% to 5% of a participant's "Organizational Volume."  The amount of the "Royalty Override" percentage that a given participant earns each month depends on the participant's "Total Volume" for that month.  Thus, 500 Total Volume points entitles the participant to a 1% Royalty Override; 1,000 Total Volume points earns a 2% Royalty Override; and so on, up to 2,500 Total Volume points which earns a maximum 5% Royalty Override.

126.   Participants are eligible to earn Royalty Overrides only if they have (i) obtained a status level of "Supervisor" or above ( *i.e.,* "Sales Leaders") and (ii) recruited a downline.

127.   As of December 31, 2014, only about 13% of all U.S. Distributors fell into the category of "Sales Leaders" who had recruited a downline.  Even among this group, most receive little or nothing in compensation from Defendants.  In 2014, approximately 57.6% of this group received an average gross annual

33

payment from Herbalife of about $299, and approximately 14.3% received nothing.  [Statement of Average Gross Compensation Paid by Herbalife to U.S. Members in 2014]

128.   The participants who receive the highest gross compensation from Defendants are at the top three status levels of the compensation system:  "Global Expansion Team," "Millionaire Team," and "President's Team," called collectively "TAB Team" ("Top Achievers Business Team").

129.   At the "TAB Team" status levels, participants may be eligible to receive three different types of income based on their downlines' purchases: Wholesale Profits, Royalty Overrides, and a third category of income called "Production Bonuses."  A Production Bonus is a monthly payment of 2% to 7% of the product purchases of the participant's entire downline, on all levels infinitely deep.

130.   Participants at the "TAB Team" status levels may also qualify to receive the "Mark Hughes Bonus Award," which is a payment based on a percentage of Herbalife's worldwide sales.

131.   It is only at the "TAB Team" status levels that a small number of participants begin to see the rewards promised by Defendants, although even at this level, the majority of participants are hardly receiving lavish income from Defendants.  For example, in 2011—the last year in which Defendants publicly released income data by participant level—the median annual compensation that participants at the "Global Expansion Team" status level received from Defendants was $19,417.  In comparison, the U.S. Census Bureau's 2011 poverty threshold for a family of two with no children was $14,657.

132.   Rewards are concentrated at the very highest levels.  Participants at the top level, "President's Team," accounted for only about 0.05% of all Distributors in 2011 but their median annual gross income from Defendants was $336,901.

133.   In 2011, the top U.S. Distributor received over $7 million from Defendants, broken down as follows:

| | |
|---|---|
| Wholesale Profits | $2,847 |
| Royalty Overrides | $944,058 |
| Production Bonuses | $4,256,817 |
| Mark Hughes Bonus | $2,000,000 |
| Total | $7,203,722 |

These reward payments were not based on retail sales to consumers, but on wholesale purchases made by downline Distributors in his worldwide organization.

134.   The only way to reach the "TAB Team" status levels is to recruit a large organization of participants at the "Supervisor" status level who purchase thousands of "Volume Points" worth of product.  Thus, for example, to reach the top level, "President's Team," a participant must recruit an organization of Supervisors who generate at least 10,000 Royalty Override points each month for three consecutive months.  Because the maximum Royalty Override percentage is 5%, this means that the first three levels of Supervisors must collectively generate a minimum total of 200,000 Volume Points of product purchases each month, for a total of 600,000 Volume Points of product purchases over the three months.

**Defendants' Compensation Plan Incentivizes Wholesale Product Purchases**

135.   Defendants' compensation plan requires large wholesale purchases of products in order for a participant to advance to a higher status level and to make money from rewards.  As explained below, participants must purchase product from Defendants, or convince others to join and purchase product from Defendants, in order to (i) qualify to move up to a higher status level; (ii) requalify for those status levels and prevent being demoted; and (iii) qualify to receive "Royalty Override" and "Production Bonus" payments from Defendants.  These product purchases are made as payments to participate in the Herbalife operation

35

rather than in response to actual retail demand for Herbalife products.

### *Product Purchases Are Required to Advance to Higher Levels*

136.   To advance from the lowest status level, "Distributor," to any of the status levels providing a higher discount, an Herbalife participant must make substantial wholesale product purchases from Defendants and/or recruit downline participants who will make substantial wholesale product purchases from Defendants.

137.   For example, reaching the status of "Supervisor" requires wholesale product purchases totaling a minimum of 4,000 Volume Points.  An order totaling 4,000 Volume Points costs roughly $3,000 and would entail a large amount of Herbalife product.  As an example, the following would represent a 4,000 Volume Point order sufficient to qualify a participant as a "Supervisor":

| SKU | Description | Qty | Volume Points Each | Volume Point Total |
|---|---|---|---|---|
| 3106 | Formula 1 shake mix canister (30 servings) | 16 | 32.75 | 524.00 |
| 0365 | Protein bar deluxe (14 bars) | 32 boxes | 13.22 | 423.04 |
| 1188 | Herbal aloe concentrate (half gallon) | 8 | 92.55 | 740.40 |
| 0106 | Herbal tea concentrate (3.5 oz.) | 16 | 34.95 | 559.20 |
| 3115 | Formula 2 multivitamin (90 tablets) | 16 | 19.95 | 319.20 |
| 3123 | Formula 3 Cell Activator (60 tablets) | 16 | 21.95 | 351.20 |
| 3277 | Lift-Off (30 tablets) | 16 | 47.70 | 763.20 |
| 1415 | Herbalife 24 – Prolong canister (37 oz.) | 8 | 41.60 | 332.80 |
|  | TOTAL |  |  | 4,013.04 |

138.   It is impossible to reach the highest status levels of Defendants' compensation program—"Global Expansion Team," "Millionaire Team," and "President's Team"—without recruiting new participants who collectively purchase large quantities of product.  Under Defendants' compensation plan, recruitment is required to reach these status levels.

### Product Purchases Are Required to Requalify for Status Levels

139.   Participants who obtain a particular status level must annually "requalify" to retain that level or be demoted.  Requalification is based on the volume of wholesale product purchases by the participant and/or his organization. To requalify as a Supervisor and retain his or her downline, for example, a participant must accumulate another 4,000 or 10,000 Volume Points, depending on the method of requalification.

### Monthly Product Purchases Are Required to Qualify for Reward Checks

140.   Participants who are eligible to receive "Royalty Overrides" or "Production Bonuses" must also accumulate, on a monthly basis, specific volumes of product purchases to "qualify" to receive those reward payments.  An eligible participant "qualifies" to receive "Royalty Override" and "Production Bonus" reward payments for a given month by accumulating in that month a threshold amount of "Total Volume" ranging from 2,500 Volume Points to 5,000 Volume Points.

141.   All of these volume requirements are based on wholesale *purchases* of product from Defendants.  Defendants do not track what happens to the product after a participant purchases it.

142.   Higher-level Distributors who are eligible to receive reward payments frequently buy Herbalife products in order to meet the thresholds for obtaining these rewards, rather than to satisfy consumer demand.   For example, analysis of Defendants' purchasing data reflects that, in the months in which participants at the "TAB Team" levels—the highest levels in the Herbalife marketing plan—received

"Royalty Override" payments, they frequently purchased almost precisely the amount of product necessary to qualify for the payment.

143.   These participants at the highest status levels who must make monthly product purchases in order to earn recruiting rewards are the most robust wholesale purchasers of Herbalife products.  In the time period from January 2009 through March 2014, such high-level participants purchased on average almost eight times as much product per person as participants at the lowest level of "Sales Leaders" (Supervisors), who by and large were ineligible for such recruiting rewards.

144.   This purchasing behavior reflects an excessive emphasis on purchasing product for the purpose of qualifying for recruitment rewards.

## CONCLUSION

145.   In sum, Defendants' compensation structure incentivizes Distributors to purchase thousands of dollars of product to receive recruiting-based rewards and to recruit new participants who will do the same.

146.   This results in the over-recruitment of participants and the over-supply of Defendants' products and exacerbates participants' difficulty in selling Herbalife products for a profit.

147.   Participants in a business opportunity should have some reasonable prospect of earning profits from reselling products to customers. However, most Herbalife participants earn little or no profit, or even lose money, from retailing Herbalife products.

148.   In the absence of a viable retail-based business opportunity, recruiting, rather than retail sales, is the natural focus of successful participants in Defendants' business opportunity.

149.   Thus, participants' wholesale purchases from Herbalife are primarily a payment to participate in a business opportunity that rewards recruiting at the expense of retail sales.

## VIOLATIONS OF THE FTC ACT

150.   Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

151.   Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

152.   Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

## COUNT I

### Unfair Practices

153.   As alleged above, Defendants promote participation in Herbalife, a multi-level marketing program, which has a compensation structure that incentivizes business opportunity participants to purchase product, and to recruit new business opportunity participants to purchase product, in order to advance in the marketing program rather than in response to actual retail demand.

154.   Defendants' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

155.   Therefore, Defendants' practices as described in Paragraph 153 above constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## COUNT II

### Income Misrepresentations

156.   In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of the right to participate in the Herbalife program, Defendants have represented, directly or indirectly, expressly or by implication, that consumers who become Herbalife Distributors are likely to earn

substantial income.

157.   In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 156 of this Complaint, consumers who become Herbalife Distributors are not likely to earn substantial income.

158.   Therefore, Defendants' representations are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III

### False or Unsubstantiated Claims of Income from Retail Sales

159.   In numerous instances, in connection with the advertising, marketing, promotion, or offering for sale of the Herbalife business opportunity, Defendants have represented, expressly or by implication, that consumers who become Herbalife Distributors are likely to earn significant full-time or part-time income from selling Herbalife products at retail.

160.   In numerous of these instances, the representations set forth in Paragraph 159 are false or were not substantiated at the time the representations were made.  Therefore, the making of the representations set forth in Paragraph 159, above, constitutes a deceptive act or practice, in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IV

### Means and Instrumentalities

161.   By furnishing Herbalife Distributors with promotional materials to be used in recruiting new participants that contain false and misleading representations, Defendants have provided the means and instrumentalities for the commission of deceptive acts and practices.

162.   Therefore, Defendants' practices, as described in Paragraph 161 of this Complaint, constitute a deceptive act and practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

163.   Consumers have suffered and will continue to suffer substantial monetary loss as a result of Defendants' violations of Section 5(a) of the FTC Act. In addition, Defendants have been unjustly enriched as a result of their unlawful acts and practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

164.   Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A.   Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

B.   Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

C.   Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

DAVID C. SHONKA
Acting General Counsel

Dated:  July 15, 2016

_____/s/_____

JANET AMMERMAN
CHRISTINE M. TODARO
DANIEL O. HANKS
LAURA SOLIS

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION